UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| ADVOCACY & RESOURCES CORP., | ) |
| Plaintiff, | ) No. 2:11-CV-00097 |
| v. | ) JUDGE SHARP |
| | ) MAGISTRATE JUDGE BROWN |
| UNITED STATES DEPARTMENT OF AGRICULTURE, an agency of the United States of America; FARM SERVICES AGENCY, an agency of the United States of America; and BRUCE NELSON, in his official capacity as Administrator of the FARM SERVICES AGENCY, | ) |
| Defendants. | ) |

## MEMORANDUM

Plaintiff Advocacy & Resources Corporation ("Plaintiff" or "ARC") has brought this action against the United States Department of Agriculture ("USDA"), the Farm Services Administration ("FSA"), and Bruce Nelson in his official capacity as administrator of FSA (collectively the "Defendants" or the "Government") as a result of the suspension imposed by the Government and the final agency action of the Government, wherein Plaintiff is entitled to judicial review thereof under 5 U.S.C. § 702, or in the alternative 28 U.S.C § 1491(b)(1), both of which effect a waiver of sovereign immunity for claims against the United States and its agencies. This matter is presently before the Court on Plaintiff's Motion for Preliminary Injunction (Docket Entry No. 5), to which Defendants filed a brief in opposition (Docket Entry No. 19), and Plaintiff filed a reply (Docket Entry No. 20). This action arises out of a purported series of actions by the USDA aimed at shutting down the business of ARC, a non-profit entity that participates in a federal government set-aside programs geared toward the employment of

1

disabled individuals and the provision of certain products to government agencies. Plaintiff seeks injunctive relief requiring that the USDA lift the contract suspension it imposed on or about May 18, 2011, and/or enjoining any enforcement of the suspension.

On September 21, 2011, the Court conducted a hearing on the motion. Having reviewed all the papers filed in support of, and in opposition to, Plaintiff's motion, and having considered the oral arguments of counsel, the Court hereby DENIES Plaintiff's motion for preliminary injunction.

## I. **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

ARC is a non-profit Tennessee corporation that maintains its principal place of business in Cookeville, Tennessee, where it operates a manufacturing and packaging facility. (Docket Entry No. 14-3 at AR 110).[1] ARC has been in operation since the 1990s with a mission to assist and provide training and employment opportunities for severely disabled individuals. (Docket Entry No. 14-5 at AR 704). ARC's primary customer is the United States Government, producing vegetable oil for domestic and export programs through the USDA and bakery mix for the Department of Defense. (*Id.* at AR 704-705; Docket Entry 14-6 at Tr. page 16, lines 22-25). ARC operates primarily under contracts designated for nonprofit companies under the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 46-48c. JWOD (now known as Ability One) was enacted to provide set aside business for the benefit of nonprofit agencies that employ blind and disabled individuals for 75 percent or more of their direct labor. (Docket Entry No. 14-5 at AR 703-704).

---

[1] The administrative record ("AR") filed by the Government is entered at Docket Entry No. 14 and is accompanied by a Certificate of the Administrative Record. Citations to the record will be abbreviated as "Docket Entry No. 14-___ at AR ___." The July 7, 2011, administrative appeal hearing transcript may be found at Docket Entry No. 14-6 at AR 1014 through AR 1104.

The legislation that governs the Ability One program includes a process for a separate Government committee to handle certain duties. JWOD required the establishment of the Committee for Purchase From People Who Are Blind or Severely Disabled (the "Committee") to administer the set aside of products and services for purchase from nonprofit agencies. (*Id.* at AR 702-703). Qualified nonprofit agencies are selected for production of a listed product or providing a listed service by a designated central nonprofit agency, NISH, Inc. ("NISH," at one time an acronym for National Industries for the Severely Handicapped) or NIB (National Industries for the Blind). NISH's focus is the employment of severely disabled individuals, and NIB's focus is the employment of blind individuals. NISH and NIB are tasked to ensure that prices are fair to all parties in the Ability One program. (*Id.* at AR 703-704).

On June 20, 2006, ARC commenced a bankruptcy case in the United States Bankruptcy Court for the Middle District of Tennessee ("Bankruptcy Court"), seeking protection under Chapter 11 of Title 11 of the United States Code. (*Id.* at AR 704). Judge Keith M. Lundin's findings indicated that prior to ARC's bankruptcy in 2006, the Committee made certain changes in the pricing for vegetable oil produced by ARC that resulted in a price structure that effectively assured that products being sold by ARC under the Ability One Vegetable Oil for FSA-KCCO Export Program could not be sold to the Government at a price that was feasible to support ARC's continued participation in the federal program. (*Id.* at AR 710-719). The Committee essentially imposed a cap on the pricing that bore no relationship to the actual costs incurred by ARC. (*Id.*). ARC had to cease operations due to the loss of money caused by the pricing dispute, and it then filed for bankruptcy protection. (*Id.* at AR 704).

Michael E. Collins ("Collins") became involved with ARC when he was appointed Chapter 11 Trustee on July 12, 2006. (*Id.*). He subsequently has served as trustee of a

liquidating trust for the benefit of ARC's pre-bankruptcy creditors and also became a member of the board of directors of ARC pursuant to the bankruptcy reorganization. (Docket Entry No. 14-6 at Tr. pages 135-137). When Collins took over as ARC Trustee, the business had ceased operations. (*Id.* at Tr. pages 123-125). Collins tried for several months to get the company back in operation and ultimately was able to reopen through a combination of locating a financing/management source and obtaining injunctive relief in a Bankruptcy Court proceeding that imposed an interim pricing formula that made it possible to get back into the vegetable oil business. (*Id.* at Tr. pages 124-126). On March 25, 2011, Collins filed a motion for contempt against the Committee asserting that the Committee's failure to act and establish pricing in accordance with Judge Lundin's prior Order served as a roadblock for the ARC Trustee to undertake any efforts to pursue any other remedy against the Government. (Docket Entry No. 14-3 at AR 18-24). The motion stated, "until the Committee actually carries out its court ordered mandate to address the proper pricing to be applied for the Impasse Period, ARC is being deprived of approximately $13,500,000 in back payments and interest that is properly owed by the USDA." (*Id.* at AR 20). In March 2011, counsel for the Committee responded to the ARC Trustee's motion by stating that the Committee had obtained evidence, which suggested that ARC obtained more than $8.5 million in compensation from USDA based on falsified information. (*Id.* at AR 35). The response of Collins indicated that the Committee was well aware that "this situation" involved a single employee, in no way involves the dollar amount referenced, and has been immediately investigated by Collins with immediate action taken. (*Id.* at AR 131).

In late August 2009, a KCCO Warehouse Licensing and Examination Division auditor came into possession of information of falsified certificates of analysis ("COAs") that

4

accompanied ARC invoices. KCCO informed USDA's Office of Inspector General ("OIG") whereupon OIG initiated an investigation. (Docket Entry No. 14-3 at AR 3). ARC knew about the issue regarding falsification of COAs as early as September 2009. (Docket Entry No. 14-6, ARC's proposed finding number 25; Docket Entry No. 14-3 at AR 248 and 264). William Farmer ("Farmer"), a Tennessee lawyer, was hired to find out what was going on internally at ARC as it related to the Government having executed a search warrant. (Docket Entry No. 14-6 at Tr. page 70, line 20; Tr. page 73, line 22 - Tr. page 74, line 4). ARC's own internal investigation revealed that Vitamin A content had been falsified on about 54 COAs[2]. (Docket Entry No. 14-6 at Tr. page 77, line 19-20). ARC insists that a "rogue" employee, Richard Foster ("Foster"), who was a member of ARC's management team[3], acted alone and that only he knew that the oil did not meet specifications and that Foster alone chose to falsify COAs rather than correct the problem. (Docket Entry No.14-6 at Tr. page 77, line 16 – Tr. page 78, line 2).

Vegetable oil to be shipped by ARC was required to be fortified with Vitamin A at a rate of 60 to 75 iu/g. (Docket Entry No. 14-3 at AR 66). According to the Suspending Official, Bruce Nelson ("Nelson" or "Suspending Official"), ARC did not just submit oil that failed to meet contractually required Vitamin A levels; rather, ARC submitted COAs with its invoices that expressly and falsely represented that the oil contained Vitamin A levels that it did not. Moreover, ARC also submitted certificates of conformance with each of its invoice packages

---

[2] On March 14, 2011, FSA/KCCO had received evidence of 47 falsified COAs from the Department of Justice. (Docket Entry No. 14-6 at ARC 1368).

[3] Foster and the management team each reported to Melissa Wilson ("Wilson"), General Manager. Wilson, in turn, reported directly to Jeff Callahan ("Callahan"). (Docket Entry No. 14-6 at Tr. Page 44, line 23 - page 45, line 11; page 109, line 5-7; Docket Entry No. 14-5 at AR 940). Wilson personally signed vendor or processor invoices that were accompanied by falsified COAs of analysis and certificates of conformance. (Docket Entry No. 14-6 at AR 1370). Both Wilson and Callahan were temporarily suspended by letters dated May 18, 2011. See (Docket Entry No. 14-3 at AR 115 and 123). Neither testified at the July 7, 2011, hearing or provided any declaration or affidavit concerning this matter. (Docket Entry No. 14-6 at AR 1373).

representing falsely that it had supplied the oil in accordance with all applicable requirements, when it had not. (Docket Entry No. 14-3 at AR 165).

ARC received a letter ("Suspension Notice") dated May 18, 2011, wherein Nelson noted the following basis for suspension:

> The action to suspend ARC is based on the commission of fraud by ARC in connection with performing public contracts; the falsification of records in its submission to KCCO of invoice packages containing falsified Barrow-Agee certificates of analysis; and the knowing failure of ARC to timely disclose to the Government, in connection with the performance of contracts, credible evidence of violation of the civil False Claims Act (31 U.S.C. 3729-3733).

(Docket Entry No. 14-3 at AR 112). Further, Nelson stated "ARC's continued failure to disclose to the Government its fraudulent activity is evidence of the firm's present lack of business integrity or honesty...." (*Id.* at AR 113).

At the time ARC was suspended, it had approximately 100 employees, and about 80 percent of the employees were devoted to the oil program. (Docket Entry No. 14-6 at Tr. page 17, lines 11-19). At least 75 percent of the direct manufacturing workers were disabled pursuant to the guidelines allowing ARC to participate in the Ability One program. (*Id.* at Tr. page 18, lines 17-21). Before the suspension, ARC supplied 20 percent of the vegetable oil bought by the USDA for various government programs. (*Id.* at Tr. page 18, lines 2-10). The vegetable oil portion of ARC's business account[ed] for 80 to 85 percent of the gross revenues, and ARC's total sales range[d] from $35 million to $50 million annually. (*Id.* at Tr. page 17, lines 2-4 and 9-10).

Plaintiff submitted information in opposition to the Suspension Notice, and an in-person appeal hearing was held in Kansas City at USDA's Kansas City Commodity Office on July 7, 2011, wherein G. Sean O'Neill ("O'Neill") was designated as the hearing officer. *See* (Docket Entry No. 14-6 at AR 1353-1374). O'Neill issued his Memorandum of Findings to Nelson on

August 9, 2011. (*Id.*). In a letter dated September 1, 2011 ("Suspension Appeal Decision"), Nelson held O'Neill's findings of fact to be neither arbitrary and capricious nor clearly erroneous; and therefore, adopted the findings of fact in their entirety as the findings of fact of the USDA and incorporated them into the administrative record. (*Id.* at AR 1341). Nelson further determined that the suspension would not be modified or terminated and would be left in force. (*Id.* at AR 1351). Upon receipt of Nelson's decision, Plaintiff filed its motion seeking relief from this Court.

## II. ANALYSIS

### A.  Scope of Review

In a case brought under the Administrative Procedure Act ("APA"), the district court is limited to reviewing the administrative record to determine whether the agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary or capricious standard is the least demanding review of an administrative action. If there is any evidence to support the agency's decision, the agency's determination is not arbitrary or capricious." *Kroger Co. v. Reg'l Airport Auth. Of Louisville and Jefferson*, 286 F.3d 382, 389 (6th Cir.2002) (internal citations omitted). The APA requires a district court to review "the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

The administrative record includes all materials "compiled" by the agency that were "before the agency at the time the decision was made." *Sierra Club v. Slater,* 120 F.3d 623, 638 (6th Cir. 1997) (quoting *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1095 (D.C.Cir.1996)). Review of the "whole record" includes all "documents and materials directly or indirectly considered by the agency." *BAR MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir.1993). Generally a court's review is confined to the administrative record, not a new record

made initially in the reviewing court. *Kroger Co.*, 286 F.3d at 387 (citing *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). The task of the reviewing court is to apply the standard of review to the agency "based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). The agency is given a "strong presumption of regularity" in its submission and certification of the administrative records. *Sara Lee Corp. v. Am. Bakers Ass'n.*, 252 F.R.D. 31, 34 (D.D.C.2008). "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *BAR MK Ranches*, 994 F.2d at 740.

### B. Legal Standard for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). The Court must assess four factors to determine if Plaintiff is entitled to a preliminary injunction: "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). The Court will address each of these factors, which are interrelated considerations that must be balanced together. *Northeast Ohio Coalition for Homeless and Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer. *Id.*

8

C.  **Discussion**

   i.  *Likelihood of Success on the Merits*

At this juncture, the Court is not deciding the merits of Plaintiff's case against Defendants, but rather the Court is called upon to determine whether Plaintiff has shown a likelihood that it will ultimately succeed on the merits.

Plaintiff seeks a determination that the decisions set forth in the Suspension Letter and the Suspension Appeal Decision are arbitrary and capricious, in excess of statutory authority, and invalid as a matter of law. (Docket Entry No. 6 at 8). As part of its claim, ARC contends Defendants' motive was in retaliation for the prior contempt motion filed as part of the bankruptcy proceedings. Defendants, however, argue that the Suspending Official, "after careful review of all the evidence," determined that ARC was not presently a responsible contractor and there was immediate need for suspension. (Docket Entry No. 19 at 16).

Under the Federal Acquisition Regulation ("FAR"), federal agencies "shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only." 48 C.F.R. 9.402(a). Suspension is a discretionary action that, "taken in accordance with this subpart, are appropriate means to effectuate this policy." *Id.* Further, "[s]uspension is a serious action to be imposed on the basis of adequate evidence, pending the completion of investigation or legal proceedings, when it has been determined that immediate action is necessary to protect the Government's interest." 48 C.F.R. 9.407-1(b)(1).

Section 9.407-2, in part, provides:

(a) the suspending official may suspend a contractor suspected, upon adequate evidence, of--

(1) Commission of fraud or a criminal offense in connection with (i) obtaining, (ii) attempting to obtain, or (iii) performing a public contract or subcontract;

\*   \*   \*

(3) Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property; or

\* \* \*

(8) Knowing failure by a principal, until 3 years after final payment on any Government contract awarded to the contractor, to timely disclose to the Government, in connection with the award, performance, or closeout of the contract or a subcontract thereunder, credible evidence of--

\* \* \*

(ii) Violation of the civil False Claims Act (31 U.S.C. 3729–3733); or

\* \* \*

(9) Commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects the present responsibility of a Government contractor or subcontractor.

(b) Indictment for any of the causes in paragraph (a) above constitutes adequate evidence for suspension....

48 C.F.R. 9.407-2.

In issuing the Suspension Notice, Nelson noted the following basis for suspension:

> The action to suspend ARC is based on the commission of fraud by ARC in connection with performing public contracts; the falsification of records in its submission to KCCO of invoice packages containing falsified Barrow-Agee certificates of analysis; and the knowing failure of ARC to timely disclose to the Government, in connection with the performance of contracts, credible evidence of violation of the civil False Claims Act (31 U.S.C. 3729-3733).

(Docket Entry No. 14-3 at AR 112).

Plaintiff concedes that with "regard to the falsification, ARC never disputed that it occurred." (Docket Entry No. 6 at 12).[4] Plaintiff argues, however, that the falsification of those

---

[4] Although Plaintiff gives a brief analysis on the issue of "failure to disclose," the Suspending Official acknowledged in the Suspension Appeal Decision that "[t]here is no longer adequate evidence that ARC failed to disclose to the Government credible evidence of a violation of the

records by a "rogue employee ended nearly two years ago" and is not alone enough to substantiate a suspension unless "immediate action was necessary to protect the Government's interest" at the time of the May 2011 suspension – not in 2008-2009 when the wrongdoing occurred. (*Id.*). According to Plaintiff, Defendants' reliance on the "nearly two-year-old information" as a justification for determining the current need for *immediate* action would be arbitrary and capricious. (*Id.*) (emphasis added)[5].

Defendants claim, nevertheless, "[n]othing in the record compels the conclusion that ARC is presently responsible." (Docket Entry No. 19 at 10). Defendants maintain (1) ARC has failed to provide the results of its internal investigations to the suspending official; (2) ARC has not "in any meaningful way" agreed to pay damages or make full restitution; (3) ARC continues to employ Wilson, who signed all the invoices at issue; and (4) likewise, Callahan, Wilson's direct supervisor and ARC's president and CEO during the commission of fraud, remains ARC's chairman and CEO. (*Id.* at 10-11). Plaintiff counters that Wilson and Callahan are now in different positions and are no longer the General Manager and CEO of ARC. *See* (Docket Entry No. 20 at 7). Nevertheless, Wilson is still presently working for the company, and Callahan is

---

Civil False Claims Act..." (Docket Entry 14-6 at AR 1346). As such, there is no need for the Court to revisit this issue.

[5] Plaintiff further argues that there have been no subsequent situations that "either the USDA or ARC know about reflecting any non-compliance with the Vitamin A specifications." (*Id.* at 15). However, Defendants argue and the administrative record shows that when USDA began additional testing in March 2011, nearly twenty-five percent of the vegetable oil failed to meet contract specifications. (Docket Entry No. 14-6 at 1349 and Docket Entry No. 19 at 11). Although, there is a factual dispute surrounding this issue, the Court cannot determine that this finding by the Suspending Official was in any way "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Further, a resolution of this issue alone is unnecessary in reaching the Court's conclusions herein.

now president of AUI.[6] (*Id.*). The Suspending Official noted in the Suspension Appeal Decision that he had "no specific evidence in the [administrative record] that AUI, Callahan, or Wilson do not remain contractually connected to ARC." (Docket Entry No. 14-6 at 1348).

Federal agencies may contract with "responsible contractors only." 48 C.F.R. 9.402(a); *see also* 48 C.F.R. 9.103(a). Under the FAR, an agency may not award a contract unless the contractor makes an affirmative determination of responsibility. 48 C.F.R. 9.103(b). Although ARC does not dispute the falsification of records by an employee, Plaintiff argues that any conjecture that ARC committed fraud is "erroneous," – stating there has been no *intention* on its part to submit any inaccurate information in conjunction with its contracts. (Docket Entry No. 20 at 4) (emphasis added). Further, ARC asserts that the Vitamin A failures are a "small contract breach." (Docket Entry No. 14-6 at Tr. Pages 253-254). This lack of accountability contributed to the Suspending Official's conclusion that "ARC's apparent refusal to comprehend the gravity [of tendering nonconforming product to the Government and accepting payment in full] indicates further that ARC is not presently responsible." (*Id.* at ARC 1351). Likewise, the Suspending Official noted, "[b]y diminishing the fraud ARC does not demonstrate itself to be a contractor that is presently responsible. Since the Government cannot contract with entities that are not responsible in the context of contractor qualifications, there remains an immediate need to suspend ARC." (*Id.*). The Court finds there was adequate evidence, at the time of the May 2011 suspension, to support the agency's determination that both the commission of fraud by ARC in performance with public contracts and the falsification of records indicated a current lack of business integrity or business honesty that seriously and directly affected the present responsibility of ARC – and thus counseled toward an immediate need of suspension.

---

[6] AUI and ARC entered into a Management Agreement on March 2, 2007. Under the agreement, it is the role and duty of AUI to conduct all aspects of the day-to-day management and operation of ARC. *See* (Docket Entry No. 14-6 at AR 1371).

Additionally, Plaintiff argues "to conclude that a non-profit entity with no source of funds other than government contracts would have to raise millions of dollars to avoid a 'temporary suspension' would clearly fall into the category of punitive action," citing 48 C.F.R. 9.402(b) wherein a suspension itself cannot be based on "purposes of punishment." (Docket Entry No. 6 at 15). However, Plaintiff appears to confuse the "effect" of the action with the "motivation" or "purpose" of the action. Plaintiff concedes that the Government was provided with altered and falsified COAs and that money is owed, although it disputes the amount. There is no direct evidence that Defendants' "purpose" was to punish Plaintiff.

Plaintiff further asserts that the administrative record is "full of evidence of how large a role the bankruptcy litigation played in the suspension." (Docket Entry No. 20 at 9). To be sure, the Suspending Official does reference the bankruptcy proceedings; nevertheless, there is insufficient evidence in the record to draw the conclusion that the suspension was in retaliation or as punishment for the prior motion for contempt.

In Nelson's September 1, 2011 letter, he stated the following:

> It is also undisputed that the contracting activity did not have sufficient, adequate evidence in September 2009 to either terminate for default or recommend suspension of ARC; not until mid[-]March 2011 did the Contracting Officer responsible for ARC contracts receive substantial falsified COAs. (FF 83 and 84). The Contracting Officer received from the Department of Justice copies of the original COAs supplied by Barrow-Agee to ARC that showed ARC supplied nonconforming fortified vegetable oil under its contracts. (AR 1089 at TR pages 301-302)[.] The Contracting Officer had not received this documentation earlier because the AUSA handling the criminal case could not turn over grand jury materials obtained by the search warrant and submitted to the grand jury discussed above until permitted by the Judge to release the grand jury materials.

(Docket Entry No. 14-6 at AR 1346). But for the close proximity in time, Plaintiff has provided this Court with insufficient evidence that the bankruptcy proceedings (and more specifically, the contempt petition, which was submitted by the ARC Trustee) should be

13

deemed the motivating factor for the suspension.

Under the APA's scope of review, the district court reviews the administrative record to determine whether the suspension decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Based on the administrative record presented for review, the Court concludes the agency's decisions set forth in the Suspension Letter and the Suspension Appeal Decision were supported by the evidence and were neither arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with law. Based on the evidence in the record at this stage in the litigation, Plaintiff does not demonstrate a sufficient likelihood of success on the merits to support the imposition of a preliminary injunction.

   *ii.* *Irreparable Harm*

A plaintiff seeking injunctive relief must demonstrate that irreparable harm is likely in the absence of an injunction, not merely speculative. *Winter*, 129 S.Ct. at 376. A plaintiff seeking injunctive relief must do more than establish the " 'possibility' of irreparable harm." *Id.* at 375.

Plaintiff contends that if the suspension is not lifted, it will "likely doom ARC to permanent closure." (Document Entry No. 6 at 7). More than 60 employees have been laid off since the suspension, and most of the remaining group "of fewer than 20 employees" will likely be laid off soon if relief is not obtained. (*Id.* at 8). ARC further claims it faces immediate adverse actions from its lenders, landlord and other creditors if it is unable to resume production under Government contracts. (*Id.*).

Defendants, however, contend that they understood that "severely disabled individuals would unfortunately lose their jobs if ARC could not participate in government contracts;"

however, "most of ARC's employees have been laid off." (Docket Entry No. 19 at 17-18). Furthermore, they argue, "the purpose of a preliminary injunction is to prevent irreparable harm; harm that has already occurred cannot support a preliminary injunction – if an injunction would remedy the past, then the harm wasn't irreparable." (*Id.*).

When courts consider irreparable harm, "[t]he key word ... is irreparable," and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against [the] claim." *Brake Parts, Inc. v. Lewis*, 2011 WL 3510225 (C.A.6 (KY) 2011) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Brake Parts, Inc.*, WL 3510225 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992)). Any harm to Plaintiff is economic or speculative, or both. At this stage, Plaintiff has not persuaded the Court that "[t]he possibility that adequate compensatory or other corrective relief will [not] be available at a later date." Even if Plaintiff were to succeed on this element, the allegations are not sufficient to outweigh Plaintiff's slim chance of ultimate success on the merits given the low threshold the Government must clear to justify discretionary decisions.

   *iii.* *Balance of Equities and Public Interest*

In determining whether to allow injunctive relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S.Ct. at 376 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

While Plaintiff argues the harm that ARC would suffer "far outweighs any harm the USDA might suffer" if a preliminary injunction is denied, the Court is inclined to disagree. The

Government has a strong interest in maintaining the integrity of its contractors. The Government's interest is not merely economic, but involves its ability to protect itself from dishonest contractors. The balance of hardships does not significantly tip in Plaintiff's favor; and likewise, the public interest weighs in favor of denying the preliminary injunction. Although the dilemma that the corporate entity now faces is unfortunate and generates sympathy for the individuals who have and/or may lose their jobs, under the standard of review for administrative agency decisions, the Court is left with no alternative.

## III. CONCLUSION

For all of the reasons stated, Plaintiff's Motion for Preliminary Injunction is hereby DENIED. The Court will return this matter to the Magistrate Judge to conduct all further case management proceedings.

An appropriate Order shall be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE